# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 11, 2026
Lyle W. Cayce
Clerk

No. 25-50747

State of Texas; Texas General Land Office; Texas Department of Agriculture; Railroad Commission of Texas; State of Kansas; State of Oklahoma,

*Plaintiffs—Appellees*,

*versus*

United States Department of the Interior; United States Fish & Wildlife Service; Doug Burgum, *Secretary, U.S. Department of the Interior*; Brian Nesvik, *in his official capacity as the Director of the United States Fish & Wildlife Service*,

*Defendants—Appellees*,

*versus*

Center for Biological Diversity; Texas Campaign for the Environment,

*Movants—Appellants*.

---

Permian Basin Petroleum Association; National Cattlemen's Beef Association; Texas Cattle Feeders Association; Kansas Livestock Association; Oklahoma Cattlemen's Association; New Mexico Cattle Growers Association; Kansas Independent Oil & Gas Association; Petroleum Alliance of Oklahoma,

*Plaintiffs—Appellees*,

*versus*

UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH & WILDLIFE SERVICE; DOUG BURGUM, *Secretary, U.S. Department of the Interior*; BRIAN NESVIK, *in his official capacity as the Director of the United States Fish & Wildlife Service*,

*Defendants—Appellees*,

*versus*

CENTER FOR BIOLOGICAL DIVERSITY; TEXAS CAMPAIGN FOR THE ENVIRONMENT,

*Movants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 7:23-CV-47, No. 7:23-CV-49

---

Before STEWART, GRAVES, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

Following the change in presidential administrations in 2025, the Fish and Wildlife Service abandoned its defense of an endangered species listing in order to settle litigation with various states and industry groups that had challenged the listing. Two conservation organizations—one an initial petitioner for the listing—moved to intervene. The district court denied their motion as untimely; in the same order, the court held the listing to be unlawful, vacated it, and remanded to the agency.

We conclude the district court abused its discretion in finding that the conservation groups' motion to intervene was untimely. So we reverse the denial of intervention. However, because the conservation groups lack

appellate standing to challenge the vacatur and remand of the listing, we decline to reach the merits of that decision.

## I.

### A.

The Endangered Species Act (ESA) empowers the Secretary of the Interior to "provide a program for the conservation . . . of endangered species and threatened species[.]" 16 U.S.C. § 1531(b). In exercising this power, the Secretary must first determine whether a species should be listed as "endangered" or "threatened." *Id.* § 1533(a).[1] The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16) (emphasis added).

Because the ESA does not define "distinct population segment," the Secretary, through the Fish and Wildlife Service (FWS), adopted a policy to clarify the agency's interpretation of the term. *See* 61 Fed. Reg. 4722 (Feb. 7, 1996) (the DPS Policy). The DPS Policy prescribes a three-factor analysis to determine whether an animal population constitutes a "distinct population segment" that should be listed as endangered or threatened. Regulators must consider a population segment's (1) discreteness relative to the rest of its species; (2) significance to the species as a whole; and (3) conservation status. *Id.* at 4725.

The first two factors—discreteness and significance—determine whether an animal population qualifies as a "distinct population segment."

[1] An "endangered species" is "any [non-pest] species which is in danger of extinction throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(6). A "threatened" species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

A population is "discrete" if it is "markedly separated from other populations of the same [species] as a consequence of physical, physiological, ecological, or behavioral factors" or if it is "delimited by international governmental boundaries." *Id.* As for a population's "significance," the DPS Policy prescribes four considerations: (1) whether a population inhabits an ecology that is unusual for the species; (2) whether its loss would create a significant gap in the geographic range of the species; (3) whether a population is the only one of its species native to its current habitat, as opposed to introduced from another environment; and (4) whether genetic differences distinguish the population from others of its species. *Id.* In short, a population is "discrete" if it is physiologically or ecologically separate from the rest of its species, and it is "significant" if it is genetically distinct or it inhabits an environment that is unique or especially valuable to the range of a species as a whole.

If a "distinct population segment" exists, the decision to list the population as "threatened" or "endangered" is informed by examining the population's conservation status. *See id.*; *see also* 16 U.S.C. § 1533(a)(1). Relying on "the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), FWS considers (1) the present or threatened destruction of the species's habitat; (2) the commercial, scientific, or recreational overutilization of the species; (3) threats to the species from disease or predators; (4) the inadequacy of existing regulations; and (5) other natural or artificial factors affecting a species's continued existence. *See id.* § 1533(a)(1); 50 C.F.R. § 424.11(c). Depending on FWS's analysis of these factors, the agency may promulgate a final rule listing an animal population as "endangered" or "threatened." 16 U.S.C. § 1533(a)(1).

No. 25-50747

### B.

The lesser prairie-chicken is a species of grouse native to the brushlands of the southwestern United States. *See* 87 Fed. Reg. 72674, 72687 (Nov. 25, 2022). The species is prized by birdwatchers for its ostentatious mating rituals and colorful plumage. *Id.* at 72692. Since the 1960s, the species has experienced massive population decline correlating with a reduction in available habitat in its native region. *Id.* at 72677–79. Today, the bird continues to inhabit a reduced range in parts of Oklahoma, Kansas, Colorado, Texas, and New Mexico. FWS has divided its current range into four "ecoregions," pictured in the map below:



Roughly 90% of the extant lesser prairie-chicken population lives in the three ecoregions that are clustered near one another in Colorado, Kansas, Oklahoma, and Texas. Just 9% of the remaining birds live in the more distant Sand Shinnery Oak Prairie Ecoregion in eastern New Mexico and the Texas Panhandle.

In response to its dwindling numbers, FWS originally listed the lesser prairie-chicken as a threatened species in 2014. *See* 79 Fed. Reg. 19974 (Apr. 10, 2014). That listing was vacated in September 2015 because FWS had failed to consider the extent of existing conservation efforts. *See Permian Basin Petrol. Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 722 (W.D. Tex. 2015). In 2016, three conservation groups (including Appellant Center for Biological Diversity) petitioned for a new listing for the bird. *See* 86 Fed. Reg. 29432, 29434 (June 1, 2021). In 2019, those petitioners sued FWS, alleging the agency had failed to act on the petition by not completing the 12-month finding required by statute. *See* 16 U.S.C. § 1533(b)(3)(B). After settling that litigation, FWS published a 12-month finding and an accompanying proposed listing in 2021. *See* 86 Fed. Reg. at 29434. After notice and comment, FWS promulgated a final rule (the Listing Rule) in November 2022. *See* 87 Fed. Reg. at 72674.

In the Listing Rule, FWS concluded that the lesser prairie-chicken consisted of two distinct population segments, Northern and Southern, with the Southern segment corresponding to the Shinnery Oak Prairie Ecoregion and the Northern segment corresponding to the other three regions collectively. *Id.* at 72680. Applying the DPS Policy criteria, FWS determined these segments were "discrete" because the Southern and Northern segments were separated by 95 miles; and "there [was] no connection between the two population segments, [and] subsequently no gene flow between them." *Id.* at 72680, 72681. FWS found the populations to be "significant" because the 95-mile separation between the segments

indicated the loss of either one would cause a significant gap in the species's range; and the physical separation between the two segments had resulted in genetic differences between the two populations. *See id.*

After concluding that the Northern and Southern populations qualified as two "distinct population segments," FWS considered whether the segments merited listing as "endangered" or "threatened" species. *Id.* at 72682. After a lengthy review of threats to the bird's habitat and the extent of existing conservation measures, FWS listed the Northern segment as "threatened" and the Southern as "endangered." *Id.* at 72745, 72746.

### C.

In March 2023, the Listing Rule was challenged by various states (the State Plaintiffs), as well as industry groups representing oil and cattle interests in the affected regions (the Industry Plaintiffs). These lawsuits were consolidated in the district court. Both sets of Plaintiffs asserted that FWS improperly applied the DPS Policy in formulating the Listing Rule. More specifically, they argued that FWS had no basis to divide the lesser prairie-chicken into distinct population segments at the first stage of their analysis.

In June 2023, the Center for Biological Diversity (CBD) and Texas Campaign for the Environment (TCE) (the Conservation Groups) moved to intervene. The Conservation Groups sought intervention of right under Federal Rule of Civil Procedure 24(a), or alternatively, permissive intervention under Rule 24(b). The district court denied the motion, holding that the Conservation Groups failed to demonstrate that the federal defendants (the Government) would not adequately represent their interest in defending the Listing Rule. The court also denied the Conservation Groups' request for permissive intervention on the ground that intervention would delay the case's resolution. However, the district court left open the possibility that the Conservation Groups might participate as amici.

Litigation between the Government and Plaintiffs continued for almost two years. In January 2025, President Trump issued two executive orders signaling a change in federal priorities regarding endangered species protection. *See* Exec. Order No. 14,156, *Declaring a National Energy Emergency* (Jan. 29, 2025) (directing agencies to "identify obstacles to domestic energy infrastructure specifically deriving from implementation of the ESA . . . [including] regulatory reform efforts, species listings, and other related matters[.]"); Exec. Order No. 14,154, *Unleashing American Energy* (Jan. 29, 2025) (calling on agencies to "suspend, revise, or rescind" actions that would be "unduly burdensome" to domestic energy development). Secretary of the Interior Doug Burgum also issued two orders prioritizing deregulation in the area of endangered species protections. *See* Secy's Order No. 3,418 (Dep't of the Interior Feb. 3, 2025) (directing agency staff to revise or rescind various endangered species regulations); *see also* Secy's Order No. 3,417 (Dep't of the Interior Feb. 3, 2025).

On March 26, 2025, the Government and Plaintiffs jointly moved to extend the deadlines for summary judgment motions and briefing in order to consider settlement options. On April 25, 2025, the Government sought a nine-day extension to continue exploring settlement. Fearing that the Government planned to abandon the Listing Rule altogether as part of a settlement, the Conservation Groups filed a "Motion for Reconsideration and Second Motion to Intervene" on May 1, 2025. In this motion, the Conservation Groups asserted that their interest in defending the Listing Rule was no longer adequately represented, such that the district court's basis for denying their first motion to intervene was no longer salient. They once again sought intervention of right, or alternatively, permissive intervention.

On May 7, 2025, prior to any summary judgment briefing on the merits, the Government moved for voluntary vacatur and remand of the

Listing Rule as part of a settlement with the Plaintiffs. In its motion, the Government conceded that FWS had improperly applied the DPS Policy. In particular, the Government represented that FWS had mistakenly relied on the 95-mile gap between the Northern and Southern segments to conclude that the reduction of the lesser prairie-chicken's range resulting from the loss of either population would be significant. In reality, the Government asserted, that 95-mile gap could establish that the two populations were "discrete," but it could not independently establish that both populations were "significant." According to the Government, this flaw materially tainted the Listing Rule, given that a redefinition of the listable populations would change the Rule's scope and content. With their second motion to intervene still pending, the Conservation Groups filed an opposition to the Government's motion.

In August 2025, the district court issued an omnibus order (the Order) that, *inter alia*, denied the Conservation Groups' second motion to intervene. The court denied intervention of right on the grounds that (1) the motion was untimely, as it came after two years of litigation and could derail settlement in a case where an agency had conceded error; and (2) the Conservation Groups had failed to rebut the presumption that the Government would represent their interests. The district court denied permissive intervention because the Groups had failed to describe their roles and potential claims as defendant-intervenors.

The district court also granted the Government's motion for remand and vacatur. The court concluded that the error conceded by FWS rendered

the resulting Listing Rule unlawful, such that vacatur of the Rule was appropriate.[2]

The Conservation Groups now appeal the denial of their second motion to intervene, as well as the district court's vacatur and remand of the Listing Rule.

## II.

The denial of a motion to intervene of right is reviewed *de novo*. *See Field v. Anadarko Petrol. Corp.*, 35 F.4th 1013, 1017 (5th Cir. 2022). "Denial of permissive intervention, on the other hand, is reviewed for clear abuse of discretion." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (citation omitted).

"[A] proposed intervenor will never be able to appeal in [an] underlying action unless the order denying intervention is first reversed." *Cook v. Powell Buick, Inc.*, 155 F.3d 758, 761 n.8 (5th Cir. 1998).[3] Thus, before addressing the remand and vacatur of the Listing Rule, we (A) explain why the Groups' intervenor status is not moot, and then (B) consider whether the district court properly handled the Conservation Groups' second motion to intervene.[4]

---

[2] The district court also denied the motions of other environmentalist groups to participate as amici, as well as the Industry Plaintiffs' motion for summary judgment (filed after the Government's motion for remand and vacatur). Those rulings are not before this court on appeal.

[3] We address later the Conservation Groups' appellate standing with regard to the remand and vacatur of the Listing Rule. For the question of intervention itself, "[t]he denial of intervention is . . . immediately appealable," and thus properly before us. *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997).

[4] We recognize that "[a]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing[.]" *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). In their first motion to intervene,

**A.**

First, the Industry Plaintiffs assert that the Conservation Groups' intervention dispute is relevant only insofar as they, if permitted to intervene, could appeal the Order. Because vacatur and remand to an agency is not an appealable final order, the argument goes, the Conservation Groups' intervention could not ameliorate any injury that the district court's decision imposed, and thus the dispute over their intervenor status is moot.

That is incorrect. It is true that "[a]n order of the district court that remands the proceedings to [an] administrative agency" is not ordinarily considered "an appealable final judgment." *Mem'l Hosp. Sys. v. Heckler*, 769 F.2d 1043, 1044 (5th Cir. 1985). But this is not a case in which a party sought to intervene only after the district court issued its order; here, the Conservation Groups asked to participate in the proceedings that led to the Order and were denied that chance. The fact that agency proceedings may continue after remand does not give rise to mootness—the question of the Conservation Groups' intervenor status "is not rendered moot simply because there is a possibility, or even a probability, that the outcome of a separate administrative proceeding may provide the litigant[s] with similar relief." *El Paso Elec. Co. v. F.E.R.C.*, 667 F.2d 462, 467 (5th Cir. 1982). Rather, the dispute over intervention would be moot only if "it [were]

---

the Conservation Groups sought the same relief as the Government, so the district court held that they did not need to establish standing. In their second motion, the Conservation Groups sought unique relief, but the district court denied the motion without addressing their standing to intervene. Thus, we consider whether the district court erred in denying intervention on the ground that the Conservation Groups' motion did not satisfy the criteria of Rule 24(a), but we forecast no position on whether the Conservation Groups have standing to intervene. "[W]e see greater wisdom in remanding for the district court to address standing and any other jurisdictional issues in the first instance." *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 595 (5th Cir. 2023).

impossible for a court to grant any effectual relief whatever to the prevailing party." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (cleaned up).

Here, the district court could still provide relief to the Conservation Groups should they enter the litigation as intervenors. *See, e.g.*, *City of Houston v. Am. Traffic Sols., Inc.*, 668 F.3d 291, 294 (5th Cir. 2012); *Gates v. Cook*, 234 F.3d 221, 231 (5th Cir. 2000). As intervenors, they would be "treated as if [they] were an original party and [would have] equal standing with the original parties." *Brown v. Demco, Inc.*, 792 F.2d 478, 480–81 (5th Cir. 1986) (quotation omitted). In the Order, the district court accepted that the Listing Rule was unlawful based on the existing parties' agreement as to the scope of FWS's error, but the court acknowledged that the extent of the Listing Rule's defects could be disputed. On remand, the Conservation Groups might seek reconsideration of the Order, and their participation as intervenors might change the outcome. "Because the district court on remand can 'fashion some form of meaningful relief'" for the Conservation Groups, "[their] appeal is not moot." *F.D.I.C. v. Belcher*, 978 F.3d 959, 961 n.1 (5th Cir. 2020) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).

**B.**

In their motion, the Conservation Groups sought to intervene as a matter of right, and they alternatively sought permissive intervention. The district court denied both avenues, but on appeal, the parties focus their attention on intervention of right under Rule 24(a). We do likewise.

To intervene of right, a putative intervenor must show that (1) its application is timely; (2) it has "an interest relating to the property or transaction which is the subject of the action"; (3) it is "so situated that the disposition of the action may, as a practical matter, impair or impede [its] ability to protect that interest"; and (4) its interest is "inadequately

represented by the existing parties to the suit." *Field*, 35 F.4th at 1017 (quoting *DeOtte v. Nevada*, 20 F.4th 1055, 1067 (5th Cir. 2021)). The Conservation Groups "bear[] the burden of establishing [their] right to intervene." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014).

Our Rule 24(a) analysis "is a flexible one, which focuses on the particular facts and circumstances surrounding each application[.]" *Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2009). This court liberally construes the criteria for intervention under Rule 24. *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) ("Federal courts should allow intervention where no one would be hurt and greater justice could be obtained."). Mindful of these principles, we address each intervention factor in turn.

**1.**

Whether a non-party's motion to intervene of right is timely "is to be determined from all the circumstances and the point to which a suit has progressed is not solely dispositive." *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 279 (2022) (cleaned up).[5] Timeliness is based on four factors: "(1) the length of time between the would-be intervenor's learning of his interest and his petition to intervene, (2) the extent of prejudice to the

[5] While this appeal is unusual in that it concerns a second motion to intervene, Rule 24 requires only that a motion to intervene be "timely." FED. R. CIV. P. 24. It has been the practice of district courts in our circuit to allow multiple motions to intervene and independently consider the timeliness of each. *See, e.g.*, *Hudson Inst. of Process Rsch., Inc. v. N.L.R.B.*, No. 4-24-cv-989, 2026 WL 1295959, at *2–3 (E.D. Tex. May 12, 2026); *see also Hopwood v. Texas*, 78 F.3d 932, 960–61 (5th Cir. 1996) (expressing that changed circumstances might justify a renewed motion to intervene). Other circuits similarly consider the timeliness of each motion to intervene. *See, e.g.*, *Kane Cnty. v. United States*, 94 F.4th 1017, 1027 (10th Cir. 2024) ("We review de novo the denial of a successive motion to intervene when a proposed intervenor shows that the circumstances have changed between the two motions to intervene." (quotation omitted)); *In re Brewer*, 863 F.3d 861, 872 (D.C. Cir. 2017); *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1401 (8th Cir. 1990).

existing parties from allowing late intervention, (3) the extent of prejudice to the would-be intervenor if the petition is denied, and (4) any unusual circumstances." *In re Lease Oil Antitr. Litig.*, 570 F.3d 244, 247–48 (5th Cir. 2009) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263–66 (5th Cir. 1977)). All "doubts [are to be] resolved in favor of the proposed intervenor." *Id.* at 248. However, while a district court's decision to deny intervention is reviewed *de novo*, its determination that a motion is untimely "is generally reviewed for abuse of discretion." *Sierra Club*, 18 F.3d at 1205 n.2.

**a.**

First, the delay in filing. "Determining the length of delay requires identifying the starting point." *Rotstain v. Mendez*, 986 F.3d 931, 937 (5th Cir. 2021). The relevant date for assessing delay is not "the date on which the would-be intervenor became aware of the pendency of the action," but when the intervenor "became aware that its interests would no longer be protected by the original parties." *Sierra Club*, 18 F.3d at 1206. A would-be intervenor need not show its interests will certainly be adversely affected, only that the existing parties no longer protect those interests. *See Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 (5th Cir. 2016). An intervenor must further be able to detail "particular ways in which [its] interests diverge from the part[ies'] and then identify the particular ways in which these divergent interests have impacted the litigation." *Entergy Gulf States La., L.L.C. v. E.P.A.*, 817 F.3d 198, 204 (5th Cir. 2016). Thus, in assessing delay, a district court must determine when the intervenor became aware of specific facts that would allow it to explain how its interests diverged from those of the parties. This analysis requires the "court [to] look to the actions of the litigants." *U.S. ex rel. Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 578 (5th Cir. 2023).

In denying the Conservation Groups' second motion to intervene, the district court suggested that the changes in environmental policy announced

by the Trump Administration in January 2025 were sufficient to put them on notice that the Government would not defend the Listing Rule. With that "starting point," the Conservation Groups delayed three months in renewing their motion to intervene.

True enough, the Administration's orders were early signs that the Government might no longer defend the Listing Rule, something the Conservation Groups acknowledge. However, to succeed on their second motion, the Conservation Groups were required to "identify the particular ways in which [the Government's] divergent interests ha[d] impacted the litigation," *Entergy Gulf States*, 817 F.3d at 204, as the district court itself noted in denying their first motion to intervene. Such specific divergence could not be substantiated by the high-level policy declarations issued by the White House and the Interior Secretary in January 2025.[6]

Looking to the litigation itself, the Government first signaled the possibility of settlement on March 12, 2025, seven weeks before the Conservation Groups moved to intervene. On April 25, 2025, the Government moved for a briefing extension to consider settlement options, suggesting that settlement (and abandonment of the Listing Rule) was not merely hypothetical, but imminent. The Conservation Groups moved to intervene just six days later, once these developments made them aware of "particular ways in which [the Government's] divergent interests ha[d] impacted the litigation." *Entergy Gulf States*, 817 F.3d at 204. Our precedents denying intervention as untimely have consistently required a

---

[6] Indeed, the same district court (and the same district judge) denied intervention to CBD in a contemporaneous case on the ground that President Trump's executive orders were insufficient to show that the Administration would not defend an ESA listing decision. *See* Order at 6–8, *Texas v. Haaland et al.*, No. 7:24-cv-233 (W.D. Tex. Nov. 26, 2025) (Dkt. 30).

longer delay. *See United States v. Covington Cnty. Sch. Dist.*, 499 F.3d 464, 466 (5th Cir. 2007) (per curiam) (four months); *Effjohn Int'l Cruise Holdings, Inc. v. A & L Sales, Inc.*, 346 F.3d 552, 561 (5th Cir. 2003) (three months); *Save Our Springs All., Inc. v. Babbitt*, 115 F.3d 346, 347 (5th Cir. 1997) (three months); *Kneeland v. N.C.A.A.*, 806 F.2d 1285, 1289 (5th Cir. 1987) ("almost four months"); *see also In re Lease Oil*, 570 F.3d at 250 (allowing intervention after a delay of two years where prejudice to the intervenor would be substantial).

Thus, the Conservation Groups did not unduly delay in filing their second motion to intervene—they waited until they could establish that their interests diverged from those of the Government, as the district court had instructed them. The district court's use of the wrong "starting point" to calculate the Conservation Groups' delay in moving to intervene constituted an abuse of discretion. *See Doe v. Glickman*, 256 F.3d 371, 378 (5th Cir. 2001) (quoting *Stallworth*, 558 F.2d at 267).

**b.**

Second, prejudice to the existing parties. "The inquiry for this factor is whether other parties were prejudiced *by the delay* [in intervening], not whether they would be prejudiced *by the addition of the claim*[.]" *Effjohn*, 346 F.3d at 561. The district court determined that such prejudice would be substantial, as intervention could stall summary judgment briefing or "allow a dissenting voice in the mix where Defendants already seek remand and vacatur[.]" The Plaintiffs agree, contending that the parties' efforts to resolve the case and prepare summary judgment briefing would be wasted if the Conservation Groups now intervened.

These protests miss the mark. "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club*, 18 F.3d

at 1206. The litigation burdens cited by the parties and the district court would exist regardless of when the Conservation Groups moved to intervene. Further, they sought intervention *before* any summary judgment briefing was completed, and *before* any settlement was presented to the court—the very reason they sought to intervene was to engage in those aspects of the case prospectively, not to reopen them after-the-fact. The timing of the Conservation Groups' second motion to intervene produced no unique prejudice to the existing parties.

**c.**

Next, prejudice to the Conservation Groups. The district court did not recognize any significant prejudice to the Conservation Groups if they could not intervene, concluding that they had not explained their proposed role as intervenors and indicating that they could participate as amici.[7]

Amicus status undoubtedly offers fewer options to a party than intervention. *See U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 430 (2023) ("[N]on-parties typically cannot do much of anything in a lawsuit."); *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019) ("[N]on-litigant parties lack [the] remedies available to the contenders in litigation."). And this limitation is especially sharp in cases with no adversarial presentation of the issues by the parties. *Cf. Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir. 1984) (explaining that amicus status is appropriate when adversarial presentation of the issues already exists in a litigation).

Moreover, our court has held that advocacy groups may be prejudiced when they are unable to intervene in litigation over agency actions that affect

[7] Despite this statement, the district court ultimately denied other environmental groups' motions to participate as amici in this case.

a group's goals. *See Glickman*, 256 F.3d at 378–79 (allowing intervention by an animal advocacy group where an adverse holding in the litigation would hamper the group's animal protection efforts); *see also Am. Train Dispatchers Ass'n v. Interstate Com. Comm'n*, 26 F.3d 1157, 1162 (D.C. Cir. 1994) (observing that parties to a rulemaking tend to be granted intervenor status more frequently). Here, no existing party persists in defending the Listing Rule. Therefore, the Conservation Groups' interest in doing so would be prejudiced significantly absent their intervention.

**d.**

Last, any unusual circumstances. *See In re Lease Oil*, 570 F.3d at 248. CBD is one of the original petitioners for the Listing Rule and has expended resources over more than a decade to finalize it. Thus, at least CBD, if not both Conservation Groups, has a considerable interest in defending the Listing Rule. *See, e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (recognizing that environmental advocacy groups are uniquely positioned to defend endangered species listings for which they petitioned). Additionally, the Government's reversal of its position has realigned the parties' objectives in the litigation and presented a greater risk that the Conservation Groups' interests will not be represented. *See W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017) (noting that a change of presidential administrations "raises the possibility of divergency of interest or a shift during litigation" (quotation omitted)). Thus, the particular circumstances of this litigation also favor finding the Conservation Groups' motion to intervene to be timely.

**2.**

A party seeking to intervene of right under Rule 24(a) must assert an interest in the action that is "direct, significant, [and] legally protectable." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464

(5th Cir. 1984). Here, the Conservation Groups' interest is the preservation of a Listing Rule that they have petitioned for and litigated to promulgate. Neither the district court nor any party denies the Conservation Groups' interest in the litigation, so this second requirement for intervention is satisfied.

**3.**

Next, an "applicant [for intervention] must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect his interest." *Sierra Club*, 18 F.3d at 1207. Here, the Conservation Groups assert an interest in the preservation of the Listing Rule and its protections for the lesser prairie-chicken. An adverse decision in this case would vacate that rule and end the endangered species protections that the Conservation Groups have been working toward. Thus, the third requirement for intervention is satisfied, as the district court concluded.

**4.**

Last, an intervenor must show "that representation of his interest [by the existing parties] may be inadequate." *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). This burden is typically "minimal." *Id.*

However, our court has developed two presumptions to guard against needless intervention. First, intervention is disfavored when the intervenor "has the same ultimate objective as a party to the lawsuit." *Texas v. United States*, 805 F.3d 653, 661 (5th Cir. 2015). This presumption may be rebutted if the intervenor shows an "adversity of interest, collusion, or nonfeasance on the part of the existing party." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 308 (5th Cir. 2022) (quoting *Texas*, 805 F.3d at 661–62). Second, "a governmental body or officer charged by law with representing the interests" of a movant is presumed adequately to represent those interests.

*Id.* This presumption may be rebutted if "the intervenor's interest is in fact different from that of the governmental party and that the interest will not be represented by the existing governmental party." *Id.* (quotation omitted). And while the Government may consider a broad range of interests in enforcing the ESA, the Conservation Groups need not "say for sure that the [Government's] more extensive interests will in fact result in inadequate representation, but [only that] they might, which is all that the rule requires" to rebut the presumption of adequate representation. *Brumfield*, 749 F.3d at 346.

In denying the Conservation Groups' first motion to intervene, the district court concluded that they had not shown that their narrower interest in preserving the Listing Rule differed from the Government's "ultimate objective" of enforcing the ESA. Moreover, the district court determined that the Conservation Groups had not substantiated any impact the Government's divergent interests might have had on the litigation, meaning they had not rebutted the presumption that the Government adequately represented their interest.

In denying the Conservation Groups' second motion to intervene, the district court acknowledged that the Government and the Conservation Groups lacked a shared objective—the Government would now scrap the Listing Rule while the Conservation Groups would preserve it. Nevertheless, the court held that the Conservation Groups had not rebutted the presumption that the Government would adequately represent the would-be intervenors' interest. Relegating the issue to a footnote, the court posited that the only evidence of inadequate representation was the announcement of changes in federal environmental priorities. The Government and the Plaintiffs similarly urge that the Government's mission of "faithful execution of the ESA" does not meaningfully differ from the objectives of the Conservation Groups.

These assertions simultaneously overstate the Conservation Groups' burden to establish inadequate representation and understate the divergence between their interest and those of the Government. To show that their "interest is in fact different from [those] of the [Government] and that the interest will not be represented" absent their intervention, *Pueblo Entero*, 29 F.4th at 308, the Conservation Groups need only "point[] to specific conduct showing that the party at issue inadequately represent[s] [their] interests, notwithstanding that it share[s] an ultimate objective." *Louisiana v. Burgum*, 132 F.4th 918, 923 (5th Cir. 2025).[8] "[A]dversity of interest" can be established simply by showing that an intervenor's interests "diverge from the putative representative's interests in a manner germane to the case." *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 543 (5th Cir. 2022). As evidence of inadequate representation, the Conservation Groups have identified not only the announced changes in agency priorities, but also the Government's efforts to vacate the Listing Rule at issue in this litigation. Moreover, the Conservation Groups' filings have indicated "distinct evidence [they] wished to introduce, remedies [they] sought, and legal arguments [they] intended to make." *Burgum*, 132 F.4th at 923.

Thus, the conflict between the Government and the Conservation Groups is more than a "mere possibility" of divergent interests. *Id.* Instead, their disagreement goes to the core question of whether the Listing Rule's protections of the lesser prairie-chicken are lawful at all. It is clear that "the intervenor[s'] interest is in fact different from that of the governmental party

[8] As other circuits have noted, it is not uncommon for agencies to change positions such that they no longer represent the interests of proposed intervenors, especially in the realm of environmental regulation. *See, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) ("[W]e have often concluded [in ESA cases] that governmental entities do not adequately represent the interests of aspiring intervenors."); *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996–97 (10th Cir. 2009) (similar).

and that the interest will not be represented by the existing governmental party." *Pueblo Entero*, 29 F.4th at 308. Especially given that the burden to demonstrate inadequate representation is normally "minimal," *Edwards*, 78 F.3d at 1005, the district court erred in concluding that the Conservation Groups had not rebutted the presumption of adequate representation by the Government.

In sum, the district court abused its discretion in concluding that the Conservation Groups' second motion to intervene was untimely, and the other elements for intervention of right are satisfied in this case. The district court thus erred in denying the Conservation Groups' second motion to intervene of right.[9]

## III.

The Conservation Groups also appeal the merits of the district court's remand and vacatur of the Listing Rule. However, "[b]efore turning to the merits of the defendants' appeal, we must assure ourselves of our appellate jurisdiction." *Waller v. Hanlon*, 922 F.3d 590, 597 (5th Cir. 2019).[10]

"To appeal a decision that the primary party [*i.e.*, the Government] does not challenge, an intervenor must independently demonstrate standing." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).

---

[9] In view of this conclusion, we need not address whether the district court abused its discretion in denying permissive intervention to the Conservation Groups under Federal Rule of Civil Procedure 24(b).

[10] The Government asserts that the Conservation Groups failed to establish standing at the outset of the appeal and thus have waived any argument that they have appellate standing. However, the Conservation Groups presented evidence of their members' injuries before the district court, and we may consider the district court record in assessing our own jurisdiction. *See Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020).

"Though related, the intervention question is not dispositive of the standing-to-appeal question; rather, an intervenor must still demonstrate an injury *from the district court's judgment* to establish appellate standing." *DeOtte*, 20 F.4th at 1070 (emphasis added) (quotation omitted). To establish an injury that would confer standing to appeal, the Conservation Groups must show (1) a concrete and particularized injury that is (2) fairly traceable to the remand and vacatur of the Listing Rule, and (3) is likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Conservation Groups lack such an injury. CBD and TCE may satisfy the injury requirement for associational standing by establishing "the presence of at least one individual [member] who has demonstrated standing to assert the contested rights as his own." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 184, 192 (5th Cir. 2012) (cleaned up). In considering members' injuries, "generalized harm to . . . the environment will not alone support standing, [but] if that harm in fact affects the recreational or even the mere esthetic interests of the [member], that will suffice." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). An allegation of a *future* injury may establish standing if the threatened injury is "certainly impending or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). However, "allegations of possible future injury" or injury based on a "speculative chain of possibilities" will not suffice. *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017). "Mere some day intentions" to view or work with a threatened species, "without any description of concrete plans, do[] not support standing." *Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) (quotation omitted).

As evidence of their members' injuries, the Conservation Groups offer a set of declarations originally presented in the district court with their first motion to intervene. Setting aside for the district court's consideration

whether the declarations support the Conservation Groups' standing to intervene, these declarations do not establish their appellate standing to challenge the Order at issue here.

Surveying the declarations, James Tutchton, a CBD member, avers that he has visited lesser prairie-chicken habitats in Colorado and "plan[ned] to visit" the same sites "in April or May 2024." According to Tutchton, a lack of listing protections would hasten the birds' extinction and "harm or destroy [his] interests in viewing the species in the wild." A second CBD member, Daniel Ginter, is an avid birdwatcher, and while he has never observed the lesser prairie-chicken, he fears that he will be unable to do so because of the bird's dwindling population and habitat. A third CBD member, Brett Hartl, has viewed the lesser prairie-chicken regularly since 2008, and he alleges that future searches for the bird would be more difficult if the bird were stripped of its listing. Last, Robin Schneider, the executive director of TCE, declared that TCE members would be harmed if the bird went extinct, but did not provide greater detail beyond her statement that "TCE and its members would be harmed if the bird were to be extirpated from Texas as it would deprive our members of the opportunity to view and appreciate them in the wild."

This testimony fails to establish members' individual standing and, by extension, associational standing for the Conservation Groups. The members' "profession of an 'intent' to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough" for appellate standing. *Lujan*, 504 U.S. at 564. And the members "'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [is] require[d]." *Id.* Furthermore, the Groups cannot establish any injury that is "fairly

traceable" to the remand and vacatur of the Listing Rule—as required for appellate standing in this case—by citing declarations of members' injuries that *predate* the Order and do not evidence any harm that arose from the district court's decision. *Id.* at 560.

Finally, the fact that the Conservation Groups were the original petitioners for the Listing Rule cannot alone satisfy the requirements for appellate standing. As the D.C. Circuit has observed, "[p]articipation in agency proceedings is alone insufficient to satisfy judicial standing requirements." *Fund Democracy, L.L.C. v. S.E.C.*, 278 F.3d 21, 27 (D.C. Cir. 2002). "The sufficiency of the sort of 'interest' allowing an interested party to petition an agency[] and the justicially protectable 'interest' required for an injury to afford standing in the courts is fundamentally the difference between the political branches on one hand and the Article III courts on the other." *Gettman v. D.E.A.*, 290 F.3d 430, 433 (D.C. Cir. 2002). Thus, the Groups' status as the original petitioners for rulemaking, while contributing to the justification for their intervention, does not itself establish an injury conferring standing to appeal the remand and vacatur of the Listing Rule.

Because the Conservation Groups lack appellate standing to challenge the remand and vacatur of the Listing Rule, we lack jurisdiction to consider the merits of that decision in this appeal.

* * *

The district court abused its discretion when it miscalculated the length of the Conservation Groups' delay in renewing their motion to intervene. And the other factors for intervention favor the Conservation Groups. Thus, the district court erred in denying their second motion to intervene. However, the Conservation Groups lack appellate standing to challenge the remand and vacatur of the Listing Rule, so we cannot reach the merits of that piece of the district court's omnibus order.

The district court's denial of the Conservation Groups' second motion to intervene is REVERSED. The case is REMANDED to the district court for further proceedings consistent with this opinion.